**MAGNUS ELECTRONICS, INC., Plaintiff,**

v.

**ROYAL BANK OF CANADA and Aerolineas Argentinas, Defendants.**

No. 84 C 7630.

United States District Court,
N.D. Illinois, E.D.

April 8, 1985.

First Supplemental Opinion May 7, 1985.

Second Supplemental Opinion
May 15, 1985.

Scott A. Brainerd, Brainerd & Bridges, Chicago, Ill., for plaintiff.

Alan S. Madans, Norman Barry, Rothschild, Barry & Myers, C. Kevin McCabe, Lord, Bissell & Brook, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Magnus Electronics, Inc. ("Magnus") has filed a multi-count First Amended Complaint (the "Complaint") against Aerolineas Argentinas ("Aerolineas") and the Royal Bank of Canada ("Bank") to recover the unpaid portion of the purchase price of two shipments of electronics equipment that, Magnus says, were delivered to the buyer in Argentina in breach of Aerolineas' and Bank's obligations to Magnus. Bank has in turn filed a First Amended Cross-claim (the "Cross-claim") against Aerolineas for indemnity or contribution, asserting the loss was attributable to Aerolineas' wrongful conduct.

Aerolineas now has moved under Fed.R. Civ.P. ("Rule") 12(b)(6) to dismiss both the Complaint and the Cross-claim because (1) Aerolineas' liability is governed by the terms of the Warsaw Convention (the "Convention," 49 Stat. 3000 TS 876, reprinted following 49 U.S.C.A. § 1502) and (2) the claims against Aerolineas are barred by the Convention's two-year limitations period. For the reasons stated in this memorandum opinion and order, Aerolineas' motion is granted.

## Facts [1]

In October 1981 Magnus contracted to sell three of its "Magnasync" generators to buyer Alfredo Di Lullo ("Di Lullo") [2] in Buenos Aires. Magnus engaged a freight forwarder to arrange for shipment to Di Lullo, and the freight forwarder then engaged Aerolineas to transport the generators from Miami to Buenos Aires. According to the Aerolineas air waybill the generators were to be delivered to Bank (as consignee) in Buenos Aires, with notice to Di Lullo of their arrival. Under the terms of its arrangement with Magnus, Bank was to hold the generators pending Di Lullo's payment of the full purchase price to Bank (for Magnus' account). Only upon payment in full was Di Lullo to take delivery of the goods.

Despite those arrangements, either Aerolineas or Bank (or perhaps the two together in some fashion) permitted delivery of the generators to Di Lullo without Bank's (and hence Magnus') receiving payment. Magnus has yet to collect any portion of the $68,946 purchase price.

In early March 1982 Magnus entered into a second transaction with Di Lullo, this time involving a shipment of transceivers. Again Aerolineas was engaged to carry the goods from Miami to Buenos Aires, where Bank was to take delivery as consignee pending payment in full of the $30,831 purchase price. On March 18 Di Lullo telephoned Magnus and said it had received the transceivers in good condition and would shortly tender payment—this despite the fact Di Lullo was not to get delivery before having paid the purchase price. To date Di Lullo has paid $30,000 on the 1982 shipment, leaving an outstanding balance of $831. Again Magnus claims the loss is attributable to either Aerolineas or Bank or both.

## Warsaw Convention

"[A]ll international transportation of persons, baggage, or goods performed by aircraft for hire" (Convention Art. 1(1)) is governed by the Convention, a uniform set of rules drafted at international meetings held in Paris in 1925 and Warsaw in 1929. "International transportation" is defined in relevant part to include (Art. 1(2)):

> any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or transshipment, are situated ... within the territories of two High Contracting Parties....

Both the United States and Argentina are High Contracting Parties to the Convention.

Probably the most frequently invoked provisions of the Convention, in litigation terms, are those limiting the liability of air carriers for loss or damage to passengers or property in the course of air transportation. However, the focus of the present dispute is the limitations period under Convention Art. 29:

> (1) The right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped.
>
> (2) The method of calculating the period shall be determined by the law of the court to which the case is submitted.

Aerolineas claims that provision bars the claims of both Magnus and Bank. They respond with several arguments in an effort to avoid dismissal:

1. Based upon the facts as set out in Magnus' Complaint, it is not clear the

---

1. As with any motion to dismiss, the well-pleaded factual allegations of the Complaint (as to Aerolineas) and the Cross-complaint are taken as true, with all reasonable factual inferences drawn in favor of Magnus and Bank respectively. *Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984). That approach of course involves no actual findings of fact.

2. Di Lullo is identified as an individual in Complaint ¶ 3, while the documentary exhibits to the Complaint refer to a firm or corporation: "Alfredo Di Lullo e Hijo" or "Alfredo Di Lullo e Hijo, S.A." For current purposes it is irrelevant which designation is right.

loss occurred "during transportation by air," in which event the Convention and its two-year limitations period would be inapplicable to Magnus' claim.

2. Bank's cross-claim is not subject to the Convention in any event.

3. Even if the Convention does apply to the claims, the Complaint's allegations leave open the possibility the limitations period has not run, at least as to the 1981 shipment.

4. Magnus' allegations of fraud on Aerolineas' part either render the two-year limitations period inapplicable or toll it on a fraudulent concealment theory.

5. Because Aerolineas is alleged to have engaged in "wilful misconduct," Convention Art. 25 says Aerolineas cannot avail itself of the two-year limitations period.

This opinion will deal successively with those contentions.

1. *Applicability of the Convention to Both Claims*

█ Article 18 defines the scope of a carrier's liability under the Convention:

(1) The carrier shall be liable for damages sustained in the event of the destruction or loss of, or damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.

(2) The transportation by air within the meaning of the preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever.

(3) The period of the transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.

Article 24(1) then provides that in cases covered by Article 18:

any action for damages, however founded, can only be brought subject to the limits and conditions set out in this convention.

Magnus and Bank argue that, on the basis of the facts alleged in the Complaint, it is not clear the improper delivery of the goods to Di Lullo occurred "during the transportation by air."

That notion is simply untenable. Magnus' contract with Aerolineas specifically required delivery of the goods shipped to Bank as Magnus' consignee. As Complaint ¶ 5 puts it:

AA undertook ... to deliver the goods to and only to the named consignee, RBC, upon the latter's proper identification or instructions at destination.

For presumptive liability purposes, Article 18(3)'s terms expressly embrace an air carrier's contractual undertaking for land delivery within "transportation by air"—a term of art. Here Aerolineas' contract necessarily called for such "transportation by air" (though non-air transportation in common parlance) by Magnus once the goods arrived at their city of destination.[3]

True enough, if the claimed damages take place during any such non-air leg of the carriage, Article 18(3) leaves open to

---

3. In effect the Magnus-Bank position would take the Convention entirely out of play for nondelivery claims (within the scope of the air carrier's contract) unless the air carrier dropped goods by parachute as its flight passed over the party to whom delivery was specified. Of course that could not be the case. It must be remembered the Convention was the product of extensive negotiation and draftsmanship, not simply an exculpatory treaty for the benefit of air carriers. As the text discussion next reflects, one of the Convention's effects was to provide the shipper with a prima facie case if the goods failed to reach their ultimate destination for *any* reason, thus placing the burden of proof on the carrier (for example, in cases of mysterious disappearance).

the carrier the possibility of escaping absolute liability under Article 18(1) by proof that someone else was responsible. But that does not limit the defined scope of "transportation by air." So long as the goods remain in the air carrier's actual or constructive possession pursuant to the terms of the carriage contract, the period of "transportation by air" does not end. If Aerolineas had put the Magnus shipments on (say) a truck and transported them from the airport in Buenos Aires to another location where Di Lullo took possession, neither Magnus nor Aerolineas would have any basis for claiming "transportation by air" had ceased. Accordingly Article 24(1) makes Magnus' action for damages subject to the terms of the Convention, including the Article 29(1) limitations period.

■ Even if the Convention is thus plainly applicable to Magnus' claim, Bank urges it should not be construed to apply to the Cross-claim. Pointing to language dealing with rights to damages under the Convention, Bank Mem. 8 argues:

This phrasing, like the language in other pertinent Convention provisions, plainly provides rights to, and imposes corresponding burdens upon, only the plaintiff shipper.

Aerolineas correctly responds that argument reflects only a partial reading of the Convention. As consignee for both the 1981 and 1982 shipments, Bank is a direct beneficiary of the Convention. Article 13 provides in relevant part:

(1) [T]he consignee shall be entitled, on arrival of the goods at the place of destination, to require the carrier to hand over to him the air waybill and to deliver the goods to him....

\*  \*  \*  \*  \*  \*

(3) If the carrier admits the loss of the goods, or if the goods have not arrived at the expiration of seven days after the date on which they ought to have arrived, the consignee shall be entitled to put into force against the carrier the rights which flow from the contract of transportation.

And Article 14 says the consignee may enforce his rights under Article 13 in his own name:

whether he is acting in his own interest or in the interest of another, provided that he carries out the obligations imposed by the contract.

Those provisions squarely gave Bank, in its own right, an action against Aerolineas under Article 18 for nondelivery or loss of the goods. Just as with Magnus' claim, Article 24(1) rendered Bank's claim subject to the two-year limitations period, whether filed as a direct action or as a cross-claim. See *Husserl v. Swiss Air Transport Co.*, 388 F.Supp. 1238, 1244–45 (S.D.N.Y.1975); *Reiser v. Meloi World Travel Service*, 18 Av.Cas. (CCH) 17,208, 17,209–10 (S.D.N.Y. 1983), both construing the "however founded" language of Article 24(1) and concluding the Convention establishes "the exclusive relief available for damages resulting from an injury sustained in international transportation" (*Husserl*, 388 F.Supp. at 1244).

2. *Measurement of the Limitations Period under Article 29*

Article 29(1) specifies any of three dates as the starting point for the running of the limitations period: the date of arrival at the destination, the date on which the aircraft ought to have arrived or the date on which transportation stopped. Magnus does not challenge the running of the limitations period on the 1982 shipment in those terms (Magnus Mem. 2).[4] As to the 1981 ship-

---

4. When Di Lullo telephoned Magnus in the middle of March 1982, Magnus plainly knew Aerolineas had not complied with its duty to deliver the goods only to Bank pending full payment. Even Magnus acknowledges the limitations period began to run at that point and (absent tolling for any reason) expired sometime during March 1984—before this suit was filed September 5,

1984. Apparently Magnus thus does not recognize that the logic (or rather illogic) of its argument as to the 1981 shipment, treated next in the text, should also lead it to challenge the limitations defense as to the 1982 shipment. This opinion will not pause for the analysis that demonstrates such is the case, but that nonrecognition on Magnus' part ought to tell us some-

ment, however, Magnus claims there is as yet no factual basis for concluding the limitations period has run.

▮ Complaint ¶ 6 alleges Aerolineas transported the generators to Buenos Aires "[a]t a time unknown to plaintiff." And Complaint ¶ 20 alleges the wrongful release of the generators to Di Lullo occurred "[a]t some point during November, 1981, or as late as some time in 1983." Those allegations, Magnus contends, leave open the possibility that the Article 29(1) limitations period did not begin to run until sometime after September 5, 1982, even though Aerolineas unquestionably took control of the generators October 19, 1981.

That argument, in all candor, is a phony. Even putting aside the fact Magnus' *original* complaint alleged the generators were shipped on October 20 and delivered to Di Lullo soon thereafter,[5] it is simply unreasonable to infer goods delivered to an air carrier on October 19, 1981 remained in transit until at least September 5, 1982. Indeed, despite its claims to uncertainty about when the goods were shipped, Magnus acknowledges the generators arrived in Buenos Aires in November 1981. Complaint ¶¶ 29–30. Moreover Magnus alleges it "has made numerous inquiries ... since 1981 as to the whereabouts of its goods." Complaint ¶ 33. Plainly Magnus knew in late 1981 something had gone wrong with the shipment. At that point, surely, the limitations period began to run.

▮ In an effort to avoid that result Magnus claims to look to the language of Article 29(1), contending the generators never "arrived at the[ir] destination" and

the "transportation [never] stopped" because the goods were never delivered to the proper consignee. If that were an accurate construction of Article 29(1), limitations would *never* run in cases where goods are somehow lost after they arrive at the airport where the plane touches down but before delivery to the party identified in the carriage contract. Surely the dates set out in Article 29(1) are not intended as alternatives that leave plaintiffs to choose the one that most extends the limitations period. Rather they are obviously designed to provide for the different circumstances under which a claim against an air carrier might arise. Their clear import is that *at the latest* the limitations period begins to run once a party with enforceable rights under a carriage contract knows or has reason to know something has gone wrong with the shipment, be it misdelivery, loss or delay. See *Strygler & Co. v. Pan American Airlines, Inc.,* 84 Civ. 2652 (JMC), slip op. at 5–6 (S.D.N.Y. Feb. 15, 1985).[6] On that (proper) reading of Article 29(1) and in the circumstances of this case, the only fair conclusion is that Magnus' and Bank's causes of action against Aerolineas accrued well before September 5, 1982.

### 3. Allegations of Aerolineas' Fraud and Wilful Misconduct

▮ According to Complaint Count VI, as to both the 1981 and 1982 shipments Aerolineas acted wilfully and fraudulently to release the shipped goods to Di Lullo before payment had been received. In addition, Complaint ¶ 33 alleges Aerolineas has fraudulently concealed its handling of

thing about the weakness of its 1981-shipment argument.

5. Aerolineas Mem. [8] says the Amended Complaint was filed *after* its counsel had discussed the Convention and its two-year limitations period with Magnus' lawyer. That makes the revised allegations about time of delivery smack of disingenuousness rather than ingenuity—the kind of conduct that could well trigger Rule 11 sanctions. On the current motion, though, this Court (consistently with Rule 12(b)(6) principles) will indulge the *reasonable* inferences in Magnus' favor.

6. That conclusion, grounded in common sense, is also reflected in Article 13(3), which allows the consignee to enforce its rights flowing from the contract either "[i]f the carrier admits the loss of the goods, or if the goods have not arrived at the expiration of seven days after the date on which they ought to have arrived." That provision operates on the obvious premise that the parties to a carriage contract will have reason to know within a short period of time whether or not the shipment has been properly delivered.

the goods "and thus unreasonably delayed plaintiff in learning of their conversion." Those allegations of fraud, Magnus asserts, are sufficient to prevent application of the Article 29(1) limitations period to either shipment, or at least to toll the limitations period until such time as Magnus learned what had happened to its goods. Bank launches a related though not identical attack based on Aerolineas' alleged misconduct.

In support of those contentions, Magnus and Bank point to two different provisions of the Convention. Neither leads to the claimed destination.

Magnus notes Article 26, which requires a party entitled to delivery to give written notice of any claim it may have against the carrier:

(1) Receipt by the person entitled to delivery of baggage or goods without complaint shall be *prima facie* evidence that the same have been delivered in good condition and in accordance with the document of transportation.

(2) In case of damage, the person entitled to delivery must complain forthwith after discovery of the damage, and at the latest, within 3 days from the date of receipt in the case of baggage and 7 days from the date of receipt in the case of goods. In case of delay the complaint must be made at the latest within 14 days from the date on which the baggage or goods have been placed at his disposal.

\* \* \* \* \* \*

(4) Failing complaint within the times aforesaid, no action shall lie against the carrier, save in the case of fraud on his part.

Focusing on the phrase "save in the case of fraud on his part," Magnus Mem. 6 says:

The Convention's exception to the time limitation by which notice may be given a carrier lies in the fundamental contractual principle that good faith in the carriage of goods should obtain in the premises, that is, that deliberate fraud and illegal conduct on the part of the carrier

will not allow the carrier to avail itself of the two-year time limitation period.

But of course the fraud exception in Article 26(4) is applicable by its express terms only to the notice rules set out in the preceding Article 26 subsections—notice rules that come into play only after the person entitled to delivery has taken possession of the goods. Suspension of that narrow rule in case of fraud surely raises no inference that fraud will also suspend the overall limitations rule of Article 29(1). If anything the inference is precisely the opposite: Inclusion of an express fraud exception in Article 26 negates an implied-in-law fraud exception to Article 29(1).

Bank cites Article 25(1) of the Convention:

(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

Bank contends Article 29(1)'s limitations rule "excludes" or "limits" a carrier's liability and is thus negated in cases involving wilful or fraudulent misconduct. But Aerolineas correctly points out an unbroken line of cases says otherwise. As *Stone v. Mexicana Airlines, Inc.*, 610 F.2d 699, 700 (10th Cir.1979) (per curiam) put it, citing earlier cases that had reached the same conclusion:

We do not believe the language of Article 25 was intended to result in periods of limitation differing in accordance with the type of conduct giving rise to the cause of action. Airplanes travel through many jurisdictions and it is evident that a uniform period of limitations was determined to be desirable.

See also the extended discussion in *Bergman v. Pan American World Airways, Inc.*, 32 A.D.2d 95, 299 N.Y.S.2d 982, 984–85 (1969), cited with approval in *Stone* and quoted at length (with total agreement) in *Kordich v. Butler Aviation Detroit, Inc.*,

103 Mich.App. 566, 303 N.W.2d 238, 239–40 (1981) (per curiam). *All* the cases teach the "exclude or limit his liability" language was aimed at the familiar provisions of Article 22, *not* at Article 29(1) and its limitations provision. In light of the universal body of authority rejecting Bank's position, it must fail here as well.

Magnus' fallback argument is that Aerolineas' fraudulent concealment of its disposition of the goods tolled the limitations period until Magnus learned what had happened. That tolling has assertedly kept the claim alive. Magnus' contention is founded on Article 29(2):

> The method of calculating the period of limitation shall be determined by the law of the court to which the case is submitted.

On the strength of that provision Magnus invokes the Illinois discovery rule codified at Ill.Rev.Stat. ch. 110, ¶ 13–215:

> If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such a cause of action, and not afterwards.

At least two independent reasons defeat Magnus' contention.

For one thing, the "legislative history" of the Convention demonstrates Article 29(2)'s reference to local law was never intended to bring into consideration the local limitation-tolling principles. On the contrary, the minutes of the Warsaw conference reflect its specific rejection of a provision that *would* have incorporated the tolling provisions of the forum's statute of limitations, substituting instead the *complete* bar of actions after two years had run. R.C. Horner and D. Legrez, *Minutes of the Second International Conference on Private Aeronautical Law* 110–13. Article 29(2) was designed to look to the law of the forum court only on the question "whether the plaintiff had taken the necessary measures within the two-year period to invoke that particular court's jurisdiction

over the action." *Kahn v. Trans World Airlines,* 82 A.D.2d 696, 705, 443 N.Y.S.2d 79, 87 (1981). In this case that issue refers not to Illinois law but to the *federal* rules, in this instance Rule 3:

> A civil action is commenced by filing a complaint with the court.

See also *Darghouth v. Swiss Air Transport Co.,* 18 Av.Cas. 18,536, 18,537.

Second, even were that not the case, the Illinois statute on which Magnus seeks to rely speaks of fraudulent concealment of the "cause of action." And the Illinois cases teach the provision does not apply where the party affected by that fraud may, with ordinary diligence, discover the claim. *Zagar v. Health and Hospital Governing Commission of Cook County,* 83 Ill.App.3d 894, 898, 39 Ill.Dec. 112, 115–116, 404 N.E.2d 496, 499–500 (1st Dist.1980).

Here there is no need to speculate as to whether the alleged fraud sought to conceal the *cause of action* or, if so, whether Magnus *could* have discovered the alleged fraud. As early as 1981 Magnus *knew* something had gone wrong with the shipment of generators (Complaint ¶ 33). By March 18, 1982 Magnus *knew* the transceivers had been improperly delivered (Complaint ¶ 23). That takes the discovery rule out of the case entirely. Magnus concededly *knew* facts on which it could base a claim of nondelivery. It cannot be heard to claim it was unaware it had a cause of action against Aerolineas, regardless of any alleged fraud on Aerolineas' part.

### Conclusion

Magnus and Bank have gone to considerable—and less than forthright—efforts to frame their allegations so as to avoid the consequences of having sat on their rights. Nevertheless, even accepting their allegations and reasonable inferences therefrom as true, it is plain they cannot prove any set of facts sufficient to establish the timeliness of their claims. Even under the liberal pleading standard of *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957), recently reaffirmed in *Hishon v. King & Spalding,*

—— U.S. ——, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), Aerolineas' motion must be granted as to Magnus' entire Complaint and Bank's Cross-claim.

Indeed this is not a case in which pleading over is called for. Magnus has already tried that (in a less-than-candid way). Accordingly not only the present pleadings but Magnus' and Bank's actions against Aerolineas are dismissed with prejudice. By a kind of poetic justice, that leaves Magnus and Bank to do battle only with each other.[7]

## FIRST SUPPLEMENTAL OPINION

This Court's April 8, 1985 memorandum opinion and order (the "Opinion", 611 F.Supp. 436) dismissed the claims of Magnus Electronics, Inc. ("Magnus") and Royal Bank of Canada ("Bank") against Aerolineas Argentinas ("Aerolineas") because those claims antedated the two-year limitations period established by Article 29(1) of the Warsaw Convention ("Convention").[1] Aerolineas has now moved under Fed.R.Civ.P. ("Rule") 54(b) for entry of a final judgment in its favor on the Magnus and Bank claims. Magnus opposes that motion with a recital of recently discovered facts (Ex. 1) that, it says, show Aerolineas fraudulently concealed the existence of Magnus' cause of action. Consequently Magnus claims the commencement of the limitations period was tolled until at least May 1984, the date Magnus says it learned of the fraudulent concealment.

It is unnecessary to detail the bulk of the newly-discovered facts, which bear primarily on the assertedly fraudulent delivery to the Argentine Air Force of the generators shipped by Magnus in October 1981. Even if true, the mere existence of that fraud does not really bear on the present motion. But Magnus also claims Aerolineas concealed the *fact* of such fraudulent delivery by providing Magnus in late 1982 with a forged document indicating Aerolineas had delivered the generators to the purchaser on the instructions of Bank (the designated consignee). Only in May 1984 did Bank admit to Magnus that document bore forged signatures. Because of that misrepresentation, Magnus claims it had no reason to suspect Aerolineas might be implicated in the disappearance of the goods.

All those assertions, which for present purposes this Court will accept as true, provide no basis for modifying the analysis set out in the Opinion. At least two reasons compel that conclusion.

First, the Convention itself does not allow for a tolling of limitations because of fraudulent concealment. That tolling doctrine derives from Illinois law, Ill.Rev.Stat. ch. 110, ¶ 13–215. And as Opinion at 15 explained, the legislative history of the Convention shows Article 29(2) was *not* intended to incorporate the tolling provisions of the forum's statute of limitations. Though some case law exists to the contrary (see, e.g., *Joseph v. Syrian Arab Airlines*, 88 F.R.D. 530, 532 (S.D.N.Y. 1980)), it does so in a wholly conclusory way, simply assuming that to be a fair reading of Section 29(2). By contrast, the analysis set out in *Kahn v. Trans World Airlines*, 82 A.D.2d 696, 705, 443 N.Y.S.2d 79, 87 (1981) and *Darghouth v. Swiss Air Transport Co.*, 18 Av.Cas. 18,536, 18,537 (D.C.D.C.1984) stands on the much firmer ground of a careful reading of the Convention's legislative history. This opinion continues to adhere to this Court's prior ruling in that respect.

Second, even were the law otherwise— even were the Illinois fraudulent concealment doctrine considered applicable here— the new facts Magnus addresses do not

---

**7.** To provide itself with the repose of a final judgment, Aerolineas may want to consider a motion under Rule 54(b). If so, its attention is called to the standards set by the Supreme Court in *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7–12, 100 S.Ct. 1460, 1464–1467, 64 L.Ed.2d 1 (1980) and by our Court of Appeals in such cases as *Bank of Lincolnwood v. Federal*

*Leasing, Inc.*, 622 F.2d 944, 947–52 (7th Cir. 1980) and *id.* at 952–56 (Swygert, J., dissenting); *U.S. General, Inc. v. City of Joliet*, 598 F.2d 1050, 1051 n. 1 (7th Cir.1979).

**1.** As in the Opinion, relevant provisions of the Convention are cited simply "Article—."

improve its position. Suppose Magnus could prove Aerolineas knew the document issued by Bank had been forged.[2] Nonetheless Magnus—by its own admission—knew as early as sometime in 1982 something had gone awry with the shipment.[3] That knowledge of probable (if not certain) nondelivery was, by definition, knowledge of a probable (if not certain) cause of action against Aerolineas under the Convention. In the face of such knowledge, and given the risk the two-year limitations period might run, it was incumbent on Magnus to act to protect its rights. There was nothing to prevent it from bringing a timely suit against Aerolineas under the Convention, and then carrying on any necessary further investigation in the context of an already-asserted cause of action.

Such is not the stuff of which fraudulent concealment of a "cause of action" is established (see Opinion at 15–16). Nothing in the newly-advanced facts creates even the reasonable inference Magnus was deceived as to the possible existence of a cause of action against Aerolineas (First Amended Complaint ¶ 33). Though it is always a source of distress when fraudulent conduct escapes untouched,[4] that is the inevitable result when the defrauded party permits the limitations period on its claim to run. It is no part of the court's duty to protect a litigant from the consequences of its own lack of diligence.

That then is the framework for consideration of Aerolineas' Rule 54(b) motion. On that score Aerolineas is clearly right: Whatever dispute remains between Magnus and Bank is unrelated to the now-dismissed claim against Aerolineas, and no piecemeal review of common issues would be caused by entry of a final order as to Aerolineas. Under the type of Rule 54(b) analysis employed (though in a wholly different context) in *Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980), Aerolineas is entitled to require the losers to appeal promptly (or, absent such an appeal, it is entitled to the comfort of repose). *Curtiss-Wright* leaves the certification decision "to the sound judicial discretion of the district court," subject to disturbance by the court of appeals "only if it can say that the judge's conclusion was clearly unreasonable."

Accordingly Aerolineas' motion for Rule 54(b) certification is granted. This Court expressly directs entry of a final judgment dismissing all claims against Aerolineas, because this Court determines (also expressly) there is no just reason for delay.[5]

EXHIBIT 1

Honorable Milton I. Shadur
United States District Judge
Room 2357
219 S. Dearborn St.
Chicago, IL 60604

---

**2.** Magnus has offered nothing specific showing Aerolineas knew the document from Bank had been forged. Absent such knowledge, of course, Aerolineas' presentation of the document could hardly be fraudulent. However, such knowledge will be assumed arguendo here.

**3.** Exhibit 1 ¶ 5 says in part:
Magnus made inquiry to the airlines in 1982 as to the fate of its goods, because it suspected irregularities....
That reference to "fate of its goods" confirms Magnus by then clearly *knew* the goods had not gone to their designated destination—else no such inquiry would have been required.

**4.** Again it should be stressed this opinion neither makes nor implies any findings in that respect. It simply accepts for argument's sake the Magnus assertions, recognizing Aerolineas has had no chance to answer them.

**5.** One issue remains. As Exhibit 1 reflects, in part Magnus' counsel asks for deletion of Opinion nn. 4 and 5 and modification of Opinion at 443. But nothing in Magnus' current submission even begins to deal with the nonforthright Amended Complaint allegations criticized in the Opinion—allegations that Aerolineas transported the generators to Buenos Aires "[a]t a time unknown to plaintiff" and that the wrongful release of the generators occurred "as late as some time in 1983." Those allegations were disingenuous when tendered, and they are no less so now. To the extent counsel believes the newly-tendered information excuses the earlier conduct (it does not), publication of this supplemental opinion and Exhibit 1 together with the Opinion will suffice.

Re: 84 C 7630
Magnus Electronics, Inc. v.
The Royal Bank of Canada
and Aerolineas Argentinas

Dear Judge Shadur:

I appeared before you on April 11, 1985, in the above-referenced cause. We discussed your Memorandum Opinion and Order regarding the airlines' dismissal from the case. You suggested that I write to you concerning any portions of your Opinion I request be omitted from publication, given that recently discovered facts have conclusively shown that plaintiff has made no disingenuous or untrue allegation either in its original or amended complaint. In essence, because plaintiff was under a disadvantage in its pleadings, not knowing the mysterious fate of its goods until only last month, plaintiff was in a quandary. It was caught, metaphorically, between the Scylla of pleading fraud with particularity under Rule 9, and the Charybdis of alleging without sufficient factual basis, invoking the spectre of Rule 11.

The evidence now shows that the defendant Argentine Airlines (AA) delivered the goods to the Argentine Air Force, not the ultimate consignee, DiLullo. We therefore respectfully request that footnotes 4 and 5 on pages 9 and 10 of the Memorandum of Opinion be omitted, given that facts do not now justify their inclusion. Pages 16 and 17 of the Opinion should in fairness be modified where it is stated that "Magnus and bank have gone to considerable—and less than forthright—efforts to frame their allegations so as to avoid the consequences of having sat on their rights".

The following facts have now become known as a result of discovery documents received from the airlines (AA) and The Royal Bank (RBC) in recent weeks:

1. DiLullo never did receive the goods in the first shipment. Instead, AA admitted for the first time in March, 1985, that delivery was made directly to the Argentine Air Force in November, 1981.

2. To thus claim and take the goods at least one, and probably more, forged documents were used bearing fake signature(s) on one or more RBC letterheads. How these documents were obtained is unknown.

3. AA is wholly-owned by the Argentine government, and has been unable to produce documents which by Argentine law it otherwise normally would and legally must retain and be able to produce. Article 846 and 853 of the Argentine Commercial Code. The original AA documents otherwise normally found in AA files (including the missing original airway bill) were apparently removed or destroyed by persons unknown, no doubt in connection with the fraudulent delivery to the Argentine Air Force only now (March, 1985) and for the first time admitted by AA.

4. Documents produced this month by RBC conclusively indicate that indeed there was a fraudulent "cover-up" of the original fraud perpetrated by the government itself. Argentina Central Bank Form 4008A dated August 6, 1982 (a form customarily used by persons applying for foreign exchange), attached hereto as Exhibit A and which has just been produced (April, 1985) by RBC (see pages 105–106, together with English translation thereof), shows on its face that the goods were taken by the Argentine government as WAR SECRET material, but that information to this effect was *purposely suppressed for almost one year because "... such information was not to be made publicly known"* prior to that date (August 6, 1982). Note that this information never reached Magnus until *April, 1985!*

5. Although Magnus made inquiry to the airlines in 1982 as to the fate of its goods, because it suspected irregularities, AA gave no official notice or other explanation to either the consignee or consignor pursuant to its obligation under Art. 13(2) of the Warsaw Convention. Magnus re-

ceived from AA's Miami office in late 1982, Exhibit "E–1" to the Amended Complaint (the document which in ± May 1984 was for the first time admitted by RBC to bear forged signatures on its letterhead stationery). This document falsely showed that the goods were properly delivered by AA to RBC, thus removing all suspicion from AA inasmuch as that document, regular on its face, clearly indicated that AA was not at fault at all, but that the goods were delivered by AA to the proper, designated consignee. As the evidence now shows, however, not only was that document clearly fraudulent when made, but it was given to Magnus by AA under circumstances (late 1982) when AA well knew that it was perpetrating *a further fraud* by passing it on to Magnus to advise Magnus that delivery was made to RBC when AA well knew that delivery had been made in November, 1981 not to RBC but to the Argentine Air Force! It thus becomes crystal clear that AA, as an agency of the Argentine government, *in conspiracy with other agencies of that government,* in late 1982 deliberately and knowingly misrepresented to Magnus the true fate of the goods: By falsely then stating that they had been delivered to RBC (while all the while knowing they had been delivered wrongly a year earlier to the Air Force) Magnus was precluded from even considering any action thereafter against AA until about May of *1984* when Magnus learned for the first time that the "Ex. E–1" document submitted to it in late 1982 by AA, was fraudulent! Moreover, Magnus still did not even learn until March of 1985 that AA had in fact surrendered the goods to anyone other than RBC, the proper consignee! It was only in March, *1985* that Magnus first learned that by its own present admissions, AA had been guilty of *two* frauds, first, in the wrongful misdelivery of the goods, and second, in deliberately misadvising Magnus as to their fate almost a year later and thus concealing its own wrongdoing by willful deceit.

6. Magnus, although alleging on information and belief in its complaint, that DiLullo had received the goods, actually had no specific information that the buyer had received the goods. DiLullo never positively indicated that he had received possession of the goods, only alluded to the fact that the goods were "there in Argentina", perhaps still waiting at the airport. (It is not uncommon for Latin American buyers to take months to obtain necessary funds to obtain goods in storage at customs or at the airport because of skyrocketing inflation and restrictive currency exchange problems.) In fact, DiLullo informed Magnus that there were no problems with the goods, but rather with the Central Bank of Argentina which was holding up payments for the Magnus imports because of foreign currency exchange restriction measures, a plausible explanation that persisted at least until late 1982. DiLullo, it is believed, thus conspired with and also acted as an agent of the government.

7. Finally, RBC, who as consignee was entitled to enforce rights against the carrier, although informed *never* informed Magnus of the goods' misdelivery to the Air Force even though RBC learned of this fact at latest in August, 1982. See Exhibit A attached hereto. RBC concealed this fact and failed to investigate the actual, known misdelivery of same, merely continuing to send out form letters to DiLullo, thereby misleading Magnus totally both as to the true, existing factual situation, and depriving Magnus of its right to timely proceed against the airlines—as well as against RBC itself for its culpable negligence.

8. In sum, the Argentine government's use of its wholly-owned airlines to illegally acquire goods for military purposes, and *its subsequent concealment of that fact* aided and abetted by AA, RBC and the buyer, prevented Magnus from vindicating its rights.

Under the aforementioned facts, Magnus proposes on May 9, at the regularly scheduled status hearing, to do the following:

1. Join the Argentine government pursuant to 28 U.S.C. 1605(a)(3);

2. Oppose AA's motion for final judgment on the basis that AA fraudulently concealed plaintiff's cause of action against the airlines, with the participation of the Argentine government; and

3. Outline its arguments against the Royal Bank of Canada under the Warsaw Convention, the Uniform Rules for Collections, I.C.C. Publication No. 322, and normal trade and business customs.

Magnus will also present a brief Memorandum of Law in support of its position with translated documents supporting the aforesaid contentions enumerated above. Certainly if any fact stated above is inaccurate counsel for the defendants, to whom I am addressing a copy of this letter, will point it out to the Court.

Yours truly,
/s/ Scott A. Brainerd
Scott A. Brainerd

cc: Kevin McCabe
 Alan Madans

## SECOND SUPPLEMENTAL OPINION

On May 7, 1985 this Court announced its memorandum opinion and order ("Opinion II") in open court and distributed copies to counsel. At that time counsel for Magnus Electronics, Inc. ("Magnus") tendered an affidavit to support the assertions in his April 30 letter (assertions this Court had accepted purely arguendo in any event, attaching the letter as an exhibit to Opinion II).

By chance this Court has just encountered a recent decision under the Tucker Act by the Court of Appeals for the Federal Circuit, which illustrates graphically the distinction between (1) knowledge of the existence of the *cause of action* (in the present case the fact of nondelivery of the generators)—knowledge that triggers the running of a statute of limitations in all events—and (2) knowledge of the particulars of how the wrong was committed. As the Court said in *Welcker v. United States*, 752 F.2d 1577, 1580 (C.A.F.C.1985) (emphasis added):

Cases from our predecessor court and other circuits firmly establish that the statute of limitations is tolled only so long as the plaintiff is unaware of the wrong committed. "Defendant is not required to wait until plaintiff has started substantiating his claims by the discovery of evidence. Once plaintiff is *on inquiry* that it has a potential claim, the statute can start to run."

That led the Court of Appeals to hold "as a matter of law," as this Court has done here, plaintiff had sufficient notice to start the limitations clock running.

It is again important to recall the terms of the Warsaw Convention. Article 29(1) establishes certain *dates* as the alternative starting points for the running of the limitations period: the date of arrival at the destination, the date on which the aircraft ought to have arrived or the date on which transportation stopped. Because nondelivery by any of those dates creates a res ipsa loquitur case (or, more accurately, a prima facie cause of action), only the arrival of the relevant date is needed to start the running of limitations. Thus if fraudulent concealment has any place in the limitations equation at all, it could only be by "concealment" of those dates or of the fact of nondelivery of the goods.[1]

---

1. Given the structure of the Convention, it is understandable why the existence of any "fraudulent concealment" notion is doubtful at best.

After all, it would be an extraordinary situation in which the fact of nondelivery of the goods or

Magnus' First Amended Complaint sought to bring itself within those narrow lines—on plainly insupportable grounds, as revealed in this Court's "Opinion I" of April 8, 1985. When that did not work, Magnus most recently sought to shift ground by an equally impermissible effort that strays even farther from any conceivably relevant "fraudulent concealment" theory, dealt with in Opinion II. *Welcker* and like opinions simply fortify the results reached in Opinions I and II.

the passage of the Article 29(1) dates could be     "concealed"—fraudulently or otherwise.