COMMERCIAL UNION INSURANCE COMPANY, a/s/o Ilapak Inc., Plaintiff–Cross–Defendant–Appellee,

v.

ALITALIA AIRLINES, S.p.A., Defendant–Cross–Claimant–Cross–Defendant–Appellant,

---

Gava International Freight Consolidators (USA), Inc., Gava International Freight Consolidators, S.p.A., Defendants–Cross–Defendant–Cross–Claimant–Appellants.

Docket No. 02–7202L, 02–7272CON.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 2002.

Decided: Oct. 23, 2003.

Nicholas E. Pantelopoulos, New York, New York (Lawrence Mentz, Biedermann,

Hoenig, Massamillo & Ruff, P.C., New York, New York, of counsel), for Defendant Alitalia Airlines, S.p.A.

Walter Barthold, Law Office of Walter Barthold, New York, New York, for Defendants Gava International Freight Consolidators (USA), Inc. and Gava International Freight Consolidators, S.p.A.

Lawrence C. Glynn, New York, New York (Nicoletti, Hornig, Campise & Sweeney, New York, New York, of counsel), for Plaintiff Commercial Union Insurance Co.

Before: WALKER, Chief Judge, OAKES, and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge.

This case is brought under the Warsaw Convention for damages to cargo. A pasta packaging machine called the Vegatronic, made in Italy, was shipped by an Italian supply company called Ilapak S.p.A. to its warehouse in the United States. Ilapak's insurer, plaintiff Commercial Union Insurance Company (Commercial Union), seeks compensation in this litigation for damage caused to the Vegatronic during transport by three carriers, all named as defendants: Gava International Freight Consolidators, S.p.A. (Gava S.p.A.), an Italian freight forwarder, took the cargo from the supplier's plant to the airport in Florence, Italy; Alitalia Airlines, S.p.A. (Alitalia), carried it by air to JFK in New York; Gava International Freight Consolidators (USA), Inc. (Gava USA), an American freight forwarder, trucked the Vegatronic to Ilapak, Inc.'s warehouse in Newtown, Pennsylvania.

The machine was packaged in a wooden crate that appeared to be in good condition at all times during the journey. Upon opening the crate, the cargo was found badly damaged. Because the carriage began in Italy and ended in the United

States, this action for damages is subject to the Warsaw Convention. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, art. 1, 49 Stat. 3000, 3014, 137 L.N.T.S. 11, 16 (1934), *reprinted in note following* 49 U.S.C. § 40105 (hereafter Warsaw Convention).

Plaintiff Commercial Union paid Ilapak's loss and then brought this suit as subrogee of Ilapak (which is not a party to the litigation) in the United States District Court for the Eastern District of New York (Glasser, J.) against the three defendant carriers that transported the Vegatronic. All three defendants disclaimed any liability for damaging the cargo, and the record furnishes no proof as to how and when the damages, amounting to $62,357.71, occurred. Defendants jointly moved for summary judgment dismissing plaintiff's complaint and plaintiff cross-moved for the same relief. The district court granted plaintiff's motion and denied defendants' motion in an order entered October 12, 2001, *see Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, No. 00 CV 1383, 2002 WL 398808, at *1 (E.D.N.Y. Jan.16, 2002), and entered a judgment against defendants in the amount of $28,000 on February 6, 2002. Defendants appeal from the October 12, 2001 order and the February 6, 2002 judgment. Plaintiff cross-appeals from the district court's denial, in a memorandum and order entered January 18, 2002, of its request for prejudgment interest.

We must decide, among other matters, which, if any, of the named defendants are liable for the damage to the Vegatronic. This is a task not unlike that faced by Theseus upon entering the labyrinth of Crete, a place laced with intricate passageways and blind alleys. Theseus had Ariadne's thread to serve as his guide. It unrolled as he entered the maze enabling him to retrace his steps by following it upon leaving. Charles Mills Gayley, *The Classic Myths in English Literature and in Art* 252–53 (Athenæum Press 1911). Similarly, the Warsaw Convention serves as a thread to guide our labyrinthian legal journey. At its end, we affirm the judgment of the district court, excepting the grant of summary judgment against defendant Gava S.p.A. Because further factual findings are required to determine whether service of process on that entity was proper, we remand that issue to the district court.

## BACKGROUND

We set out the facts. In December 1998 Ilapak S.p.A. contracted with defendant Gava S.p.A. to transport the Vegatronic from Italy to the United States. Gava S.p.A. issued Ilapak an air waybill for the cargo dated December 11, 1998. The air waybill named Ilapak S.p.A. as consignor shipper, and Ilapak USA in Newtown, Pennsylvania as consignee. The waybill bore the statement, "GOODS HAVE BEEN ACCEPTED FOR CARRIAGE[,] GAVA IFC AS CARRIER'S AGENT OF ALITALIA," and the words "GAVA IFC AS CARRIER[']S AG OF ALITALIA" were printed above the blank labeled "Signature of Issuing Carrier or its Agent." Florence was specified as the airport of departure and New York as the airport of destination. Alitalia was listed as the "first [c]arrier."

On the same day, Alitalia issued its own air waybill for shipment of the Vegatronic from Florence, Italy to New York. Alitalia's air waybill named Gava S.p.A as shipper and consignor, and Gava USA as consignee. This waybill included in the space designated for "Issuing Carrier's Agent Name and City" the statement "GAVA IFC SPA FIRENZE GAVA IFC AS

CARRIER[']S AGENT." Ilapak was not named on Alitalia's air waybill.

On December 22, 1998 Gava S.p.A. picked up the Vegatronic at the Ilapak plant in Italy and transported it to Alitalia's terminal in Florence where it was loaded and shipped. Upon arrival at JFK airport in New York, Alitalia unloaded the machine and placed it in its warehouse there. On December 23, 1998 Gava USA picked it up and—pursuant to standard practice—a Gava USA representative signed the delivery documents. Although the Gava representative did not uncrate or inspect the Vegatronic, he signed the delivery document in a blank next to the words "Received in Good Order & Condition."

Gava USA transported the crated Vegatronic on December 23 by truck to Ilapak's warehouse in Newtown, Pennsylvania, where it arrived the same day at 5:00 p.m. Because of the hour, the Ilapak employee who took delivery did not inspect the contents of the crate, but signed a receipt under the legend "Received in Good Order." When Ilapak employees opened the crate and inspected the cargo the next morning they found significant damage and promptly notified Gava USA. On December 29, 1998 Gava USA, in turn, sent Alitalia a "Preliminary Claim of Cargo Discrepancy and Irregularity," which contained the statement: "DAMAGED [sic] FOUND AT CONSIGNEE'S WAREHOUSE." The total damage alleged was $62,357.71.[1]

With this recitation of the facts, we turn to the issues raised on appeal. Alitalia challenges the grant of summary judgment to Commercial Union on the ground that Ilapak's subrogee, Commercial Union, lacks standing to sue the airline under the Warsaw Convention. Further, Alitalia con-

tends it cannot be held liable under the Convention's rules because plaintiff has failed to prove the cargo was damaged during the air carriage portion of the journey. The Gava defendants maintain that plaintiff's claims should have been dismissed due to lack of proof of service of process on Gava S.p.A. and because there was no proof of any connection between Gava S.p.A. and Gava USA. They jointly argue, in addition, that plaintiff's subrogor's representations as to the good condition of the cargo when delivered in Newtown, Pennsylvania preclude plaintiff from successfully presenting a claim for damages.

## STANDARD OF REVIEW

Because we have before us an appeal from the grant of summary judgment, we conduct *de novo* review to determine whether the record reveals the existence of any material issue of fact that would bar such relief. *See Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 100 (2d Cir.1997); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In so doing, we stand in the place of the district court and are guided by the same principles. *See Podell,* 112 F.3d at 100.

## DISCUSSION

### I Warsaw Convention

■ Liability for personal injury and damage to goods during international flight is governed by the provisions of the Warsaw Convention. As a treaty adhered to by the United States, it is the supreme law of the land and trumps local law when it applies. *See* U.S. Const. art. II, § 2

---

1. Although not relevant for disposition of this appeal, we note that there are some slight discrepancies in the factual record regarding

when the Gava–Alitalia air waybill was signed and when the Vegatronic arrived in New York and in Newtown, Pennsylvania.

and art. VI. The Convention governs "all international transportation of persons, baggage, or goods performed by aircraft for hire." Warsaw Convention, art. 1(1). Where applicable, its terms provide the exclusive basis for recovery. *See id.* art. 24 ("In cases [involving damage to cargo], any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention."); *cf. El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 160–61, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (holding that if recovery for personal injury aboard aircraft or during embarking or disembarking not allowed under Convention, it is not available at all).

■ Certain general principles guide interpretation of the Warsaw Convention. Where the language of such an international treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty. *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134–35, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (quoting *The Amiable Isabella,* 19 U.S. (6 Wheat.) 1, 71, 5 L.Ed. 191 (1821) (Story, J.)). This principle recognizes that the Warsaw Convention is aimed at providing unifying norms in a world of diverse legal systems. *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 552, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991) (describing Warsaw Convention's purpose of "achieving uniformity of rules governing claims arising from international air transportation"). To import meaning into a treaty from an outside source risks disrupting the very uniformity the Convention aims to provide.

■ Yet, when a treaty is reasonably susceptible to more than one interpretation, secondary sources must be employed to ascertain appropriate meaning. *See Chan,* 490 U.S. at 134, 109 S.Ct. 1676. In so doing, we strive to conform our reading to the treaty's original intent and purpose.

*See Air France v. Saks,* 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). Some useful secondary sources are found in the drafting documents (travaux préparatoires), *see Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996), the opinions of sister signatories at international conferences, *see Saks,* 470 U.S. at 404, 105 S.Ct. 1338, interpretations by our own executive, *see Tseng,* 525 U.S. at 168–69, 119 S.Ct. 662 (citing *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)), and post-ratification practices of the signatory nations, *see Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 255, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984). With this overview of the Convention in mind, we analyze the issues raised on appeal.

### II Plaintiff's Standing to Sue

■ Alitalia argues first that because plaintiff Commercial Union does not meet the Convention's standing requirements, it lacks standing to sue. Plaintiff, as an insurer subrogee of Ilapak, accedes to all the rights that its insured would have were it to have brought the instant suit. *See American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999). To determine whether plaintiff has standing, we must therefore decide if Ilapak itself would have had such standing.

Alitalia's challenge emphasizes that actions for damage to goods brought under the Warsaw Convention are subject to the limits expressly set forth in the text. *See Tseng,* 525 U.S. at 167, 119 S.Ct. 662. It directs us to Article 24, which states

(1) In the cases covered by articles 18 and 19 [covering damage for destruction, loss or delay to cargo and baggage] any action for damages, however founded, can only be brought subject to the condi-

tions and limits set out in this convention.

(2) In the cases covered by article 17 [covering injury or death to passengers] the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

Warsaw Convention, art. 24.

Although Article 24 indicates that suits for both personal injury and property damage are subject to the limits of the Convention, it makes clear that standing in suits for personal injury is not prejudiced by the treaty's provisions. Alitalia contends that the absence of a similar declaration in Article 24(1), dealing with cargo, is evidence that standing for such cases is meant to be limited by the "conditions and limits" the treaty imposes.

Alitalia asserts that the relevant limits governing who may bring suit are found in Article 30(3) of the Warsaw Convention, which provides

> As regards baggage or goods, the . . . consignor shall have a right of action against the first carrier, and the . . . consignee who is entitled to delivery shall have a right of action against the last carrier, and further, each may take action against the carrier who performed the transportation during which the destruction, loss, damage, or delay took place. These carriers shall be jointly and severally liable to . . . the consignor or consignee.

*Id.* art. 30(3).

Alitalia avers that the above language limits standing solely to the consignor and consignee named on the air waybill creating the contract for carriage. Because Alitalia's air waybill names only Gava S.p.A. as consignor and Gava USA as consignee, the airline maintains that only those parties have standing to bring suit, and that Ilapak, as a third party, has no standing under the Convention and must instead look to the Gavas for recovery of its loss.

### A. Restrictions to Suit, if Any, Apply Only in Successive Carriage by Multiple Carriers

In attempting to resolve this issue, we note at the outset that it is not clear whether the language regarding consignors' and consignees' rights in Article 30(3) is meant to bar suits by third parties absolutely, or whether it is simply declaratory of the rights of these parties. Scholars have noted that it is uncertain whether the Warsaw Convention imposes any restrictions on standing at all. *See* Georgette Miller, *Liability In International Air Transport: The Warsaw System in Municipal Courts* 249–56 (1977); Notes and Comments *Transporting Goods by Air,* 69 Yale L.J. 993, 1010–11 (1960). We need not resolve this issue because even assuming Article 30(3) limits suit to consignees and consignors only, we think Ilapak nonetheless has standing.

Despite Alitalia's implicit assertion that Article 30(3) governs all situations under the Warsaw Convention, any standing restrictions in that article are clearly intended to operate only in the specific instance of successive carriage by multiple carriers, as is evident from the margin note next to the section stating that it covers "[t]ransportation by successive carriers." *See* Warsaw Convention, art. 30. Beyond this obvious marker, the limited applicability of Article 30(3) is further demonstrated by the fact that both 30(1) and 30(2) deal directly with cases of carriage by "various successive carriers," suggesting a common thread among the three paragraphs. *See id.* art. 30(1)-(2). This common thread is supported by the word-

ing of Article 30(3), which provides the "consignor shall have a right of action against the first carrier, and the ... consignee who is entitled to delivery shall have a right of action against the last carrier." *Id.* art. 30(3). Such language lays out a division of rights that would be unnecessary, and indeed nonsensical, in a case involving only one carrier. Thus, we conclude that Article 30(3) applies only in the case of successive carriage by more than one air carrier.

■ The Warsaw Convention defines successive carriage as "[t]ransportation to be performed by several successive air carriers," but further instructs that such arrangements "shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation ..." Warsaw Convention, art. 1(3). In this case, the parties plainly regarded the shipment of the Vegatronic as a "single operation," as evidenced by the fact that the air waybill issued by Gava S.p.A. noted Ilapak USA of Newtown, Pennsylvania as the consignee. Hence, even if this transport involved "transportation to be performed by several successive air carriers," we are constrained by Article 1(3) not to treat it as such. This is also true even if, as here, the transportation "has been agreed upon under the form of a ... series of contracts." *Id.* Accordingly, we find that the restrictions on who may sue contained in Article 30(3) do not apply.

In order to show that standing is limited for third parties like Ilapak, another "condition or limitation" on right to sue would have to be identified, either explicit or implicit in the treaty's provisions. Alitalia does not identify any such provision, and we have found none. Indeed, it appears that no restrictions exist that *per se* limit third parties from having standing to sue under the Warsaw Convention.

**B.** *Agency Relationship Enables Plaintiff to Sue in Place of Consignor or Consignee*

■ Outside the context of successive carriage, the Convention does not discuss which parties have standing for cases of damage to cargo. Courts determining which parties have a right to sue have found guidance in Articles 12 and 13, which govern the rights of the consignor and consignee named on the air waybills. Article 12 gives the consignor the right to dispose of the goods by withdrawing them at the airports of departure and destination, stopping them in the course of the journey, requiring their return, or calling for them to be delivered at the place of destination. *See* Warsaw Convention, art. 12(1). Article 13 confers on the consignee the right to require the carrier to deliver the air waybill and the goods, and if the goods do not arrive or the carrier admits liability for their loss, the consignee may enforce the rights flowing from the contract of carriage. *See id.* art. 13. Courts have assumed that the consignor and consignee, as the parties with rights over the goods, were the parties in interest entitled to sue under the Convention. *See, e.g., Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1025 n. 2 (2d Cir.1996) (inferring standing for consignee based on Article 13); *Lufthansa German Airlines v. American Airlines, Inc.,* 797 F.Supp. 446, 452–53 (D.Vi.1992) (stating, based on Articles 12, 13 and 14 governing rights over goods in transit, that consignors and consignees have right of action); *Parke, Davis & Co. v. British Overseas Airways Corp.,* 11 Misc.2d 811, 812–13, 170 N.Y.S.2d 385 (City Ct. of N.Y.1958) (same); *see also* Miller, *supra,* at 249–56.

These courts do not identify any specific restriction on standing for cases of non-successive carriage. Rather, they infer it

from the general grant of rights in the cargo conferred by Articles 12 and 13, along with the declaration in Article 14 that the consignee and consignor "can respectively enforce all the rights given them by articles 12 and 13, each in his own name, whether he is acting in his own interest or in the interest of another." *See* Warsaw Convention, art. 14; *see also Lufthansa*, 797 F.Supp. at 452–53; *Parke, Davis*, 11 Misc.2d at 812–13, 170 N.Y.S.2d 385.

Articles 12–14, where the conferral of standing is rooted, discuss only rights of parties to exercise control over goods in transit, and do not speak to standing, let alone limit it. Moreover, the rights in these sections are explicitly qualified.

Articles 12, 13, and 14 [discussing rights of consignors and consignees over goods] shall not affect either the relations of the consignor and the consignee with each other or the relations of third parties whose rights are derived either from the consignor or the consignee.

Warsaw Convention, art. 15(1).

This provision plainly suggests that any legal relationships third parties possess vis-à-vis consignees and consignors under local law are not altered by those portions of the Warsaw Convention that define consignees/ors' rights. *See* Minutes, Second International Conference on Private Aeronautical Law, Oct. 4–12, 1929, Warsaw 176 (Robert C. Horner & Didier Legrez, trans. 1975) (hereafter Minutes) (remark by the Warsaw Convention reporter that although it is not explicitly stated, where the Convention does not govern, "it's the common law which is applicable"); *cf. Zicherman*, 516 U.S. at 224–25, 116 S.Ct. 629 (local law applied to determine cognizable harm in personal injury cases because Warsaw Convention clearly declines to govern).

Hence, a party not named in a contract for carriage who under local law would have a right to sue through a legal relationship with the consignor would likewise have such a right under the Warsaw Convention.

Consistent with this reasoning, courts that have found standing in the consignor and consignee have left open the possibility that a party not named on the air waybill nonetheless could have standing by virtue of a legal relationship with the consignor or consignee making it the true party in interest. *See, e.g., Lufthansa*, 797 F.Supp. at 453 (recognizing third party standing of subrogor based on its status as true party in interest); *Bennett Imp. v. Continental Airlines, Inc.*, No. 87 CV 29, 1998 WL 34031697, at *4 (D.Mass. Dec. 27, 1998) (noting plaintiff could bring suit as undisclosed principal of consignee listed on air waybill); *Leon Bernstein Commercial Corp. v. Pan Am. World Airways*, 72 A.D.2d 707, 421 N.Y.S.2d 587, 588–89 (1st Dep't 1979) (allowing owner of goods to sue if it proved it was undisclosed principal of named consignor); *Parke, Davis*, 11 Misc.2d at 812–13, 170 N.Y.S.2d 385 (indicating standing allowed if carrier had notice that an unnamed party to contract were true party in interest); *cf. Johnson v. American Airlines, Inc.*, 834 F.2d 721, 724–25 (9th Cir.1987) (leaving open possibility of third party suits despite limits of Article 24(1)); *Kenner Prods.-General Mills, Inc. v. The Flying Tiger Line, Inc.*, No. 87C 126, 1987 WL 11629, at *2 (N.D.Ill. May 22, 1987) (conferring standing on original shipper to sue both freight forwarder as the first carrier in successive carriage, and air carrier that freight forwarder separately hired as the carrier causing the damage).[2]

**2.** Recent amendments to the Warsaw Convention further support that third parties' rights to bring suit in cargo cases were not meant to be compromised in the original Convention.

## C. Resolution of Standing Issue

■ Given the foregoing analysis we are unpersuaded by Alitalia's assertion that, because the Gavas are the only named consignors and consignees, they are the only relevant parties; the Warsaw Convention nonetheless permits Ilapak to sue Alitalia if it is shown that Ilapak had a legal relationship with Gava S.p.A. making it the true party in interest.

■ Alitalia asserts that no such relationship exists. In support of that argument it cites case law for the proposition that between the carrier and the original shipper, liability runs to the middle man alone. *See, e.g., Rank Precision Indus., Inc. v. Jardine Air Cargo (U.S.) Ltd.,* No. 84 C 8612, 1986 WL 6096 (N.D.Ill. May 20, 1986). That proposition however, misstates the law applicable to the instant case. It is true that freight forwarders like Gava typically serve as intermediaries, or "middle men," between an actual carrier and an original shipper. In the process, a freight forwarder typically operates, though at different times, as an agent for the original shipper and for the carrier

performing the transit. Far from cutting off liability, the intermediary function a freight forwarder assumes frequently makes a carrier liable to the shipper. At common law, for instance, the original shipper was ordinarily entitled to sue either the forwarder or the carrier for loss of cargo, on the theory that the original shipper is an undisclosed principal of the forwarder, which is considered to act as an agent of the original shipper with respect to the actual carrier who performs the carriage. *See Chicago, Milwaukee, St. Paul & Pac. R.R. Co. v. Acme Fast Freight, Inc.,* 336 U.S. 465, 487–88 n. 27, 69 S.Ct. 692, 93 L.Ed. 817 (1949); *see also Leon Bernstein,* 421 N.Y.S.2d at 589.

Here we find Ilapak to be the true party in interest due to an agency arrangement between Gava S.p.A. and Alitalia. This agency creates a right in Ilapak to bring suit against Alitalia as if it had contracted directly with Alitalia in the first instance. *See* Restatement (Second) of Agency § 144 (1958) (principal is subject to liability upon contracts made by an agent as if principal itself had entered into contract).

On March 4, 1999, Montreal Protocol No. 4 became effective in the United States, S. Exec. Rep. No. 106–35, at 3 (1999), amending the language of Article 24(2) to read:

In the carriage of cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and limits of liability set out in this convention *without prejudice to the question as to who are the persons who have a right to bring suit and what are their respective rights.*

Article 24 of Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, as amended by the Protocol done at the Hague on Sept. 8, 1955, *reprinted in* S. Exec. Rep. No. 105–20, at 21–32 (1998) (emphasis added). The version of the Warsaw Convention codified at 49 U.S.C. § 40105 has not incorporated these modifications to the statute, however, as we discussed

in *Chubb*, because it was ratified by the Senate, Montreal Protocol No. 4 governs. *Chubb & Son, Inc. v. Asiana Airlines,* 214 F.3d 301, 307 n. 4 (2d Cir.2000).

The new language clearly imposes no limits on standing. The legislative history of the Montreal Protocol in the United States indicates that the current language is merely a clarification, and not an alteration of the prior wording. The State Department's report to the Senate, purporting to summarize significant changes introduced by the amended language, described new Article 24 as "mak[ing] clear that the liability limit cannot be exceeded for cargo [and] clarif[ying] that any action for damages ... can only be brought subject to the conditions and limits set out in the Convention." S. Exec. Rep. No. 105–20, at 14. This explanation emphasizing the restrictiveness of the provision would indeed be strange if the amended Convention were also intended to significantly broaden the class of potential plaintiffs.

Both Ilapak and Gava asserted in the proceedings below that Gava S.p.A. acted as an agent for Alitalia. Alitalia did not contest agency in the district court, although on appeal it insists no agency relationship existed. Alitalia offers no evidence to support this assertion, and in any event, it may not create an issue of fact on appeal when it failed to do so in the trial court.

Whether an agency relationship exists is a mixed question of law and fact. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 385–86 (2d Cir.1994). Establishment of such relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. *See* Restatement (Second) of Agency §§ 15, 26; *Pan American World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters.)*, 744 F.2d 293, 295 (2d Cir.1984); *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 499 (N.Y.App.Div.1981). In addition, the principal must maintain control over key aspects of the undertaking. *See In re Shulman Transp.*, 744 F.2d at 295; *Meese*, 436 N.Y.S.2d at 499. Control is not a crucial question where the issue is liability for a contract, however. If the agent had authority to enter into the contract, the principal will be bound. *See* Restatement (Second) of Agency § 147.

Gava S.p.A. believed itself to be an agent of Alitalia—it states in its answer to the complaint that it acted as an agent, both for securing air transit with Ilapak, and for accepting the cargo for carriage. Further, Gava S.p.A represented itself as Alitalia's agent on its waybill to Ilapak, and when picking up the cargo, it noted on that waybill that it was doing so as Alitalia's agent. Alitalia admits in its submissions that it issued an air waybill to Gava S.p.A. upon which, in a box labeled "Issu-

ing Carrier's Agent" it said "Gava IFC SPA Firenze Gava IFC as Carrier[']s Agent." Based on this evidence, it is incontrovertible that Gava S.p.A. was acting as an agent for Alitalia, at least for the purpose of entering into a contract for carriage on its behalf. Not only are the historical facts present to demonstrate an agency relationship, but where, as here, a party such as Alitalia represents that an agency relationship exists, that party becomes liable for transactions entered into by the putative agent. *See* 2A C.J.S. Agency § 49 (2003). Consequently, based on facts not in dispute, an agency relationship between Gava S.p.A. and Alitalia existed as a matter of law. *See Cabrera*, 24 F.3d at 386 & n. 14 (citing 3 C.J.S. Agency § 547 (1973)).

Moreover, even were Alitalia's arguments on appeal supported, they tend to confirm the existence of an agency relationship. Alitalia declares that Gava S.p.A.'s authority in issuing the Alitalia air waybill was that of a travel agent, *i.e.*, that it had authority only to issue the waybill as a travel agent would a passenger ticket. Alitalia concludes that such a relationship makes it, in effect, a subcontractor to Gava S.p.A. However, in the type of relationship described—common in the air transport industry—the party issuing the document of carriage in effect acts as an agent. *Cf. Kapar v. Kuwait Airways Corp.*, 845 F.2d 1100, 1103–04 (D.C.Cir.1988) (describing typical practice of carriers issuing tickets for other airlines, and noting the agency relationship arising therefrom); *Block v. Compagnie Nationale Air France*, 386 F.2d 323, 334–35 (5th Cir.1967) (discussing relationship between carrier who issues tickets and one performing the transit); *Eck v. United Arab Airlines, Inc.*, 360 F.2d 804, 814 (2d Cir.1966) (carrier issuing tickets for other airline acts as agent of other airline). Since the waybill was is-

sued by Gava S.p.A., pursuant to its authority to do so, there was an agency relationship between it and Alitalia.

 In its reply brief, Alitalia attempts to show that an agency relationship cannot exist as a matter of law, due to the provisions regulating foreign freight forwarders in the Code of Federal Regulations. The relevant provision states

A foreign air freight forwarder may act as agent of a shipper, or of a direct air carrier that has authorized such agency, if it expressly reserves the option to do so when the shipment is accepted. A foreign air freight forwarder shall not act as the agent of any direct air carrier with respect to shipments accepted for forwarding.

14 C.F.R. § 297.5 (2003). Alitalia seizes upon the last sentence of this provision, insisting that Gava S.p.A., as a foreign air freight forwarder, cannot be an agent of Alitalia. We disagree.

First, it is uncertain whether this provision even applies given that 14 C.F.R. § 297.11 disclaims the U.S. Department of Transportation's jurisdiction over goods originating in a foreign country, unless it decides that exercising jurisdiction is in the public interest. *See* 14 C.F.R. § 297.11. Second, regardless of the section's applicability, Alitalia's interpretation of the provision is incorrect. The first sentence of § 297.5 makes clear that such agency relationships are allowed. The commentary provided by the Civil Aeronautics Board in connection with the adoption of the regulation, in addition, makes plain the intent to grant "permission for foreign freight forwarders to act as agents of either shippers or of direct carriers [to] parallel the [regulations on] U.S. air freight forwarders." Final Rule to Liberalize Regulation of Foreign Indirect Cargo Carriers, 44 Fed.Reg. 69,633 (Dec. 4, 1979).

Admittedly, the first sentence of 14 C.F.R. § 297.5 may appear to be in tension with the section's second sentence, which is where Alitalia's argument rests. However, we read the two sentences to address different situations. In the first, the forwarder is in the process of accepting the shipment. In the second, the carrier has already accepted it. The logical conclusion is that agency relationships are allowed—if the forwarder so elects *upon acceptance* of a shipment—but a forwarder may not declare an agency relationship *after* it has accepted a shipment for forwarding if it did not do so at the outset. "By requiring the forwarder to reserve the option to act as either the agent of the direct carrier or of the shipper *when accepting the shipment for carriage*," the Civil Aeronautics Board explained in the notice of proposed rulemaking, "the shipper [is] put on notice of who has responsibility for the shipment as principal." Proposed Rule to Liberalize Regulation of Foreign Indirect Cargo Carriers, 44 Fed.Reg. 30,694, 30,695 (May 29, 1979) (emphasis added). Here, it is clear that Gava S.p.A. not only reserved the option to be an agent when it accepted the shipment, but it in fact acted as an agent for Alitalia from the time the shipment was accepted.

The consequence of such an agency relationship with Alitalia is that Ilapak may sue Alitalia as principal for the contract brokered by Alitalia's agent Gava S.p.A. *See* Restatement (Second) of Agency § 144. Thus, Ilapak has standing to sue Alitalia under the Warsaw Convention. Accordingly, because Commercial Union, as subrogee, stands in the shoes of Ilapak, it accedes to all its rights. *See American Bureau of Shipping*, 170 F.3d at 353. Commercial Union may therefore have standing under the Convention by extension of the analysis set forth above, as a party with rights ultimately deriving from

a legal relationship with the named consignee/consignor.

## III Liability

### A. *Article 18(3)'s Presumption*

The Warsaw Convention, by its own terms, applies only to losses occurring "during the transportation by air." *See* Warsaw Convention, art. 18(1). Transportation by air is specifically defined as

the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever.... The period of the transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport.

*Id.* art. 18(2)-(3).

 The language's clear import is that the Convention does not apply to non-aircraft losses occurring outside an airport, absent special circumstances, such as an emergency landing. Hence, for Commercial Union to be able to sue Alitalia under the Convention, it must establish that the loss in question occurred during flight. Plaintiff's burden is eased by a presumption set out in Article 18(3)

If, however, such transportation [by land, sea, or river] takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.

*Id.* art. 18(3).

 The parties acknowledge that under Article 18(3), when land transport is performed incidental to a contract for air carriage, a shipper is entitled to presume that any damage to goods took place during the transportation by air, if no one can determine where the loss actually occurred.

Alitalia's second argument is that Commercial Union cannot avail itself of the presumption because none of the land transportation in question was performed pursuant to the contract for air carriage. Instead, Alitalia suggests that Ilapak's shipping contract falls under Article 31, which covers combined transportation by air and some other means.

In the case of combined transportation performed partly by air and partly by any other mode of transportation, the provisions of this convention shall apply only to the transportation by air, provided that the transportation by air falls within the [requirements of the Convention].

*Id.* art. 31(1).

 In situations of combined land and air transport which do not fall within the scope of Article 18(3)—*i.e.*, are not done in performance of a contract for air carriage for loading, delivery, or transshipment—Article 31(1) places the burden on a shipper to prove that the damage took place during the air transport leg of the journey in order for the Warsaw Convention to apply. *See* Miller, *supra*, at 152.

### 1. Characterization of Transport

The question we face therefore is whether the land transportation undertaken by Gava is an instance of carriage incidental to the transportation by air within the meaning of Article 18(3). If so, then the presumption applies. However, if the ground transport was a distinct leg in an instance of combined carriage, then it falls within Article 31 and plaintiff has the burden of proving that damage to the cargo took place during the air carriage for the Convention to apply.

The Warsaw Convention does not define precisely the scope of what may be considered land carriage done in the performance of a contract for air carriage. The treaty does not specify who must be a party to the contract, or if the air carrier itself must perform the loading, delivery or transshipment, or whether the air carrier must even have knowledge or consent to such ground transportation taking place to fall within Article 18(3).

Alitalia raises these ambiguities to support its assertion that the presumption of liability does not apply to it. The carrier points out initially that the overland carriage involved in the present case cannot be considered to have been done "in the performance of a contract for transportation by air," *id.* art. 18(3), because the waybill it issued did not provide for ground transportation. Two separate contracts for carriage existed, only one of which involved Alitalia. Alitalia's contract for air carriage covered only transport from Florence to New York. Thus, the air carrier asserts, any land transport could not have been done in performance of any contract for air transit to which Alitalia is a party.

In support of this argument, Alitalia cites *Railroad Salvage of Conn., Inc. v. Japan Freight Consolidators (U.S.A.) Inc.*, 556 F.Supp. 124 (E.D.N.Y.1983), *aff'd,* 779 F.2d 38 (2d Cir.1985), and *Magnus Elects., Inc. v. Royal Bank of Canada,* 611 F.Supp. 436 (N.D.Ill.1985), for the proposition that the Article 18(3) presumption of liability does not apply to any land transport not undertaken as a contractual obligation of the airline itself. But we think these cases inapposite to the present situation. In *Railroad Salvage,* a shipment disappeared after the airline had delivered it to the consignor's trucking company. *See* 556 F.Supp. at 126–27. In *Magnus Electronics,* a bank, perhaps acting at the direction of the airline, mistakenly allowed delivery

of a shipment before a condition precedent—payment for the goods—had occurred. *See* 611 F.Supp. at 438. In both of those cases, the loss to the goods had unquestionably occurred on land outside an airport, and thus the presumption of Article 18 would not have applied. *See also Victoria Sales Corp. v. Emery Air Freight, Inc.,* 917 F.2d 705, 707 (2d Cir. 1990). In the case at hand, the location of damage is unknown.

Notwithstanding the inapplicability of these cases, we disagree with Alitalia that the absence of a provision for ground transport on its waybill precludes application of the liability presumption. An examination of Article 18(3)'s purpose and drafting history sheds some light on the issue. The provision was intended to reflect the reality that in cargo shipment, people often expect door-to-door delivery, a service that is simply not possible without the aid of transportation other than aircraft. *See* S. Exec. Rep. No. 105–20 at 52. In such situations, the drafters of the Convention realized that firms other than those that conduct air transport might necessarily be employed.

Nothing in the Convention text or drafting history suggests that the airline itself needed to have provided for this ground transport. The minutes from the drafting convention reveal that its purpose is to avoid precisely the difficulty we now face—that of determining where damage occurred—regardless of whether the airline had responsibility for the goods before they reached its hangar or after they left it. In choosing liability rules in the treaty's drafting Convention, a proposal was advanced by the French representative to begin the period of liability from the time the carrier takes possession of the goods. *See* Minutes, *supra,* at 74–78. Henry DeVos, the reporter to the Convention and its

principal architect, criticized the French proposal, saying

> [T]he difficulty is not resolved in saying that "the goods are received by the carrier". Outside the aerodrome often enough they are carried by a truck, perhaps by railroad. How do you want the consignor to establish at what moment the liability of the air carrier commenced? He does not even know when the goods are taken over by the carrier!
>
> It's in the face of these difficulties that we have adopted a unique solution, ... Not a definitive system of liability, but simply a presumption[.]

*Id.* at 77. The Convention delegates eventually rejected the French proposal in favor of DeVos' idea, reflected in the language of the present Article 18(3). This evinces a primary goal of protecting plaintiffs by easing their evidentiary burden, and disregards the question of whether the air carrier has any control over the ground transport. Thus, we believe the absence of a provision for ground transport on an air carrier's waybill cannot preclude application of Article 18(3). This is consistent with the practice of several courts in the cases we have found addressing the issue. *See, e.g., Jaycees Patou, Inc. v. Pier Air Int'l, Ltd.,* 714 F.Supp. 81, 83–84 (S.D.N.Y. 1989) (applying presumption where contract for air carriage with freight forwarder included door-to-door delivery); *Arkwright Mutual Ins. Co. v. KLM Royal Dutch Airlines,* No. 94 Civ. 0174, 1995 WL 491490, at *3 (S.D.N.Y. Aug.17, 1995) (applying presumption where forwarder shipped goods by land per original shipper's instructions; indicating that forwarder issued waybills as carrier's agent but presumption would apply even absent agency); *Boehringer Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.,* 531 F.Supp. 344, 347–48 (S.D.Tex.1981) (presumption covers original shipper's own transport of goods to air carrier's facility at airport before contract for carriage began), *rev'd on other grounds,* 737 F.2d 456 (5th Cir.1984).

While the presumption may at times work a hardship on air carriers, it can be seen as a concession granted to shippers in exchange for the limitation on liability air carriers enjoy under the Warsaw Convention. It furthers the Convention's goal to "balance the interests of [those] seeking recovery for ... injuries, and the interests of air carriers seeking to limit potential liability." *Tseng,* 525 U.S. at 170, 119 S.Ct. 662; *see also Magnus Elects.,* 611 F.Supp. at 439 n. 3 (noting that the Convention is not simply "an exculpatory treaty for the benefit of air carriers" and that in the case of mysterious disappearance of goods it seeks to "plac[e] the burden of proof on the carrier").

### 2. Gava–Ilapak Contract

Thus, the important factor in applying presumptive liability is not whether the air carrier itself has agreed to delivery, but simply whether the carrier is party to any contract for air carriage that contemplated delivery by another means. The relevant contract for air carriage in this case is that between Gava and Ilapak, and anything incidental to air carriage in the present context is that done in furtherance of that initial contract. Looking to the Gava–Ilapak contract is consistent with precedent and practice. In the context of the Warsaw Convention, a contract for air carriage is thought to begin when the original traveler or shipper closes a contract for air carriage, whether or not the contract is with the actual air carrier performing the carriage, the first airline in a chain of successive carriage, or an intermediary. *See Block,* 386 F.2d at 332–34 (holding contract for carriage concluded between passenger and party who arranges trans-

port, even if that party is not actual carrier).

■ The understanding of the original parties to the contract is thought to be relevant. *See Al–Zamil v. British Airways, Inc. (In re Alleged Food Poisoning Incident, March, 1984 )*, 770 F.2d 3, 5–7 (2d Cir.1985) (looking only to intent of original contracting parties to determine destination point); *Petrire v. Spantax, S.A.*, 756 F.2d 263, 265–66 (2d Cir.1985) (in successive carriage, looking to intent of original contracting parties to determine origin and final destination of journey).

■ Hence, action done in performance of a contract is that action contemplated by the original parties. In this case Gava S.p.A. and Ilapak would be the relevant parties, and the Gava S.p.A. air waybill is the appropriate document. The contract of carriage thus began when Gava S.p.A. picked up the goods from the supplier Ilapak in Italy and ended when Gava USA delivered the goods to Ilapak in Pennsylvania. Everything done in between can reasonably be said to be done in the performance of that contract. In consequence, if it was a contract for transport by air, and the contract contemplated ground delivery to Ilapak's warehouse, then the presumption undoubtedly applies.

■ The Ilapak–Gava S.p.A. contract unquestionably contemplates primarily air transport. As an agent of Alitalia, Gava S.p.A. had the authority to create a contract for *air* carriage, and by virtue of the agency relationship, Alitalia was made party to this contract.[3] The contract, labeled an "air waybill," provides shipment by air to be performed by Alitalia from Florence to New York, further evincing its primary purpose is air carriage.

The Ilapak–Gava S.p.A. contract does not mention anything about ground transport or door-to-door delivery. Another prong of Alitalia's argument contends that the absence of an explicit provision for delivery in the waybill forecloses a finding that delivery was rendered in performance of the contract. However, ground transport and delivery were unquestionably part of that contract despite the absence of explicit provisions. The waybill is only *prima facie* evidence of its terms under Article 11(1) of the Convention. Warsaw Convention, art. 11(1). That delivery at Ilapak's warehouse in Pennsylvania was an intended part of the conveyance is evident from the fact that Gava USA was the consignee entitled to receive the cargo in New York listed on Alitalia's waybill. If delivery had not been contemplated, Ilapak would have had to be named as consignee, so that it could have accepted the goods itself. *See* Warsaw Convention, art. 13 (entitling consignee to delivery). The fact that Gava ultimately delivered to Ilapak is persuasive evidence that this was what was intended all along.

We recognize that the drafters of the Convention did not intend Article 18(3)'s presumption of liability to apply for every sort of combined land and air carriage. As DeVos notes in his closing report to the Convention, the presumption applies to "cases of carriage of minimum importance

---

**3.** Freight forwarders are recognized as having the ability to enter into contracts for air carriage, even though they perform no air carriage themselves. They are often thus labeled "indirect air carriers." *DHL Corp. v. Civil Aeronautics Bd.*, 584 F.2d 914, 915 (9th Cir. 1978) (finding freight forwarders to be indirect air carriers which undertake the responsibilities of air carriers without performing the actual carriage); *Martin Marietta Corp. v. Harper Group*, 950 F.Supp. 1250, 1257 (S.D.N.Y.1997) (holding freight forwarder to be "issuing carrier" and "first carrier" to deal with shipper, despite statements on waybill to the contrary).

up to the aerodrome of departure or out of the aerodrome of destination [and] does not cover the case where carriage is performed by several modes of carriage of which only one portion is by air." Minutes, *supra,* at 252.

The phrase "carriage of minimum importance" is never explained. We recognize that a journey between New York City and Newtown, Pennsylvania may seem like a long one to be incidental. However, the expansive distances often involved in international shipment make relative the concept of "minimum importance." The reality that airlines operate more frequently out of major cities than rural areas makes it likely that ground transit of minimum importance for purpose of delivery could, in some contexts, be quite far. Indeed, distance is nowhere a factor in any of the cases we have found addressing this issue. Because the case before us falls within the Convention's only explicit definition for incidental transport—that there be a contract for carriage that contemplates primarily air transport, but where some ground transport is also performed—the damage to the cargo therefore presumptively occurred during flight.

B. *Does Condition of Goods During Transit Negate Presumption?*

 Alitalia's final assertion is that the presumption of Article 18(3) does not apply to the facts of the present case, because Gava USA, upon receipt of the cargo from Alitalia in New York, without uncrating or inspecting the cargo, signed a receipt noting that the goods were received in "Good Order & Condition." It

later sent Alitalia notice of the damage after it was discovered at Ilapak's warehouse. If Gava USA's statement demonstrates that the goods actually were delivered on the ground without damage, such would rebut the presumption of air carrier liability. *See Victoria Sales,* 917 F.2d at 707; *Railroad Salvage,* 556 F.Supp. at 126.

 Under the Convention, "[r]eceipt by the person entitled to delivery ... of goods without complaint shall be *prima facie* evidence that the same have been delivered in good condition and in accordance with the document of transportation." Warsaw Convention, art. 26(1); *see also Denby v. Seaboard World Airlines, Inc.,* 737 F.2d 172, 180–82 (2d Cir.1984). Without inspection, however, such a statement could only apply to apparent damage. To deal with the problem of non-apparent damage, the framers of the Convention allotted a seven-day time period in which a party entitled to delivery may complain of damage to a shipment. *See* Warsaw Convention, art. 26(2); Minutes, *supra,* at 213–15. Accordingly, if a party complains of damage to goods within the time limit, the goods cannot be said to have been received "without complaint," and no *prima facie* evidence is present.

 Here, Gava USA's representation that the cargo was received in good order was effectively retracted by its timely complaint of damage. Moreover, since Gava USA did not in fact inspect the contents of the crate upon receipt, its statement could only have related to the apparent condition of the crate, and not its contents, the machine itself. Absent other proof, it cannot be concluded that the Vegatronic was in good condition upon delivery.[4] Conse-

---

4. Alitalia advances in a footnote an additional related argument, declaring that plaintiff has not offered proof that the cargo was delivered to Alitalia for carriage in good condition in the first instance. It cites cases arising under

statutes analogous to the Warsaw Convention for the proposition that plaintiff must establish that the goods were handed over for delivery in good order to make out a *prima facie* case. *See, e.g., Bally, Inc. v. M.V. Zim*

quently, the presumption of liability applies to Alitalia.

■ The Gavas begin their brief with a similar claim that they cannot be liable in any way, because Ilapak's employee signed its delivery receipt in the space indicating that the goods were received in good order. The Gavas' claim has only marginal importance since Alitalia is presumptively liable for damage. Moreover, for the reasons explained in this section, the Gavas' claim is meritless.

### IV Gava S.p.A.'s Claim of Lack of Service of Process

■ Having dealt with Alitalia's contentions on this appeal, we turn to Gava S.p.A.'s challenge to the district court ruling. Gava S.p.A. contends that it was not served with process in accordance with Federal Rule of Civil Procedure 4(f), governing service of process on individuals in a foreign country. In support of this assertion, defendant points out that no evidence shows that service was made upon it. Commercial Union submitted a letter of notice that it had allegedly delivered to the Clerk of the court and which was marked "delivered by hand," but the docket sheet does not reflect receipt by the Clerk. The original letter was not in the court file and plaintiff could not provide a copy of the messenger receipt from the letter's delivery. Hence, there is nothing in the record to indicate that service was made in accordance with the Federal Rules.

Gava S.p.A. contends, as a result, that the district court lacked personal jurisdiction over it and that it should have been dismissed from this suit. Because of this

defect, both Gavas urge that summary judgment should be granted in favor of all the defendants, as the absence of one defendant in its view is fatal to plaintiff's claim. Defendants so conclude because Commercial Union's claim is based on collective liability, requiring that all defendants be served for plaintiff to maintain its cause of action.

As an initial matter, we note that the district court ruled that issues of fact exist as to the sufficiency of service on Gava S.p.A. It is somewhat surprising therefore that it granted summary judgment against "all defendants," including Gava S.p.A., in light of that ruling. Because factual issues do exist, we must remand.

The district court recognized, as we do, that in light of the evidence, it strains credulity to believe that the two Gavas have no corporate connection, as defendants assert, and thus service on one did not effect service on the other, *see Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1333 (E.D.N.Y.1981) (collecting cases and discussing how a foreign company may be amenable to suit via a domestic agent or subsidiary). The fact that the two companies share substantially the same name, the same counsel at trial and on appeal, and the same Internet site, strongly suggests a connection. The fact that Gava S.p.A.'s employees refer to Gava USA as "the New York office," also points to a corporate relationship.

■ When defending a post-discovery challenge to personal jurisdiction, a plaintiff must make an averment of facts sufficient to establish jurisdiction over the defendant. *See Ball v. Metallurgie Ho-*

---

*America*, 22 F.3d 65 (2d Cir.1994). This argument was not raised before or considered by the district court and, unsurprisingly, there is no evidence in the record that would allow us to evaluate it. We therefore decline to

pass on it. In any event, Article 18 places the burden of proof on Alitalia to show that the cargo was damaged before it received the cargo for shipment, and it has offered no evidence to rebut its liability.

boken–Overpelt, S.A., *902 F.2d 194, 197 (2d Cir.1990)*. *A defendant must be given an opportunity to contest plaintiff's factual allegations, in which case a hearing is required at which plaintiff must prove jurisdiction by a preponderance of the evidence.* See id. *Plaintiff might well be able to satisfy its burden at a hearing, but for us to make the necessary factual findings on appeal would deprive defendant of its due process rights. We therefore must vacate the district court's grant of summary judgment as to defendant Gava S.p.A. and remand the issue of jurisdiction to the district court.*

■ Even assuming a deficiency in service on Gava S.p.A., plaintiff's claims are not thereby doomed, as defendants contend. Claims brought on theories of joint and several liability may name one, some, or all potentially liable parties, whose burden is then to seek indemnification from one another. *See* Restatement (Third) of Torts § 22 (2000). Gava S.p.A.'s absence from the suit only cuts it off from liability, leaving plaintiff to look to the other defendants.

### V Commercial Union's Cross–Appeal

■ We pass to the final issue, one raised by plaintiff's cross-appeal. Following the grant of summary judgment in favor of Commercial Union, it petitioned for prejudgment interest on the award. It maintains that the Supreme Court's decision in *Zicherman* establishes that local law governs. *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996); NY CPLR § 5001 (McKinney 2003) (party entitled to prejudgment interest as of right for contract claims); *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir.1984) (same). The district court denied plaintiff's petition.

Commercial Union agreed to entry of judgment in the amount of $28,000, less

than the actual cost of the Vegatronic, because the liability limits of the Convention restricting awards in cargo cases to $20/kg. of cargo (the machine's weight as listed on the waybills was 1400kg.) permit no greater award.

In *O'Rourke v. Eastern Airlines, Inc.*, 730 F.2d 842 (2d Cir.1984), *overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225, 230, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), we considered the prejudgment interest issue. That case involved an action pursuant to Article 17 of the Convention for damages resulting from the death of a passenger that occurred on a flight en route from New Orleans to New York. A jury found for the victim and awarded damages, which were subsequently reduced to $75,000 pursuant to the Convention's then effective limit of liability for personal injury. The plaintiff requested prejudgment interest on the award, which, if granted, would have raised the total award above the $75,000 liability cap. The argument advanced was that because the Convention does not mention prejudgment interest, it is a matter of local law and therefore not subject to the liability cap. *Id.* at 852. We denied the award, ruling that prejudgment interest is not a subject where courts are directed to apply the law of the forum, and that to allow prejudgment interest in excess of the Convention's liability cap undermines its framers' primary aim to limit recovery against airlines for negligence. *Id.* at 853. We extended this principle to cargo cases in *Exim Industries v. Pan Am. World Airways, Inc.*, 754 F.2d 106, 109 (2d Cir.1985).

Commercial Union declares our precedents are no longer good law in light of the Supreme Court's decision in *Zicherman*. In *Zicherman*, plaintiffs were relatives of a person killed when a Korean Airlines jet strayed into Soviet airspace and was shot down. The relatives sought, among other

claims, damages for loss of the victim's society. *See Zicherman,* 516 U.S. at 220, 116 S.Ct. 629. The question was which law applied to determine the types of injuries or loss for which the Warsaw Convention allowed recovery. The Supreme Court looked to Article 17, which governs personal injuries. It states that "[t]he carrier shall be liable for damage sustained in the event of . . . death." Warsaw Convention, art. 17. The Court held that Article 17 leaves to adjudicating courts the task of specifying what harm is cognizable. The Court read this provision together with Article 24(2), which provides that actions under Article 17 are brought "without prejudice as to who are the persons who have the right to bring suit and what are their respective rights." Accordingly, the Court ruled that "the law of the Convention does not affect the substantive questions of who may bring suit and what they may be compensated for. Those questions are to be answered by the domestic law selected by the courts of the contracting states." The Court determined that the local law that governs is the law of the forum state. *Zicherman,* 516 U.S. at 218–19, 116 S.Ct. 629. Commercial Union contends that *Zicherman* overrules our precedents so that prejudgment interest should be allowed under local law. *Cf. Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 20–21 (2d Cir.1996) (remanding issue of prejudgment interest for determination under Ohio law).

Prejudgment interest is not available in the present case under *Zicherman.* Rather, the reasoning of *O'Rourke* controls. Applying local law to plaintiff's request for prejudgment interest would grant it an award in excess of the Convention's limits. To say that local law applies under *Zicherman* fails to address *O'Rourke*'s central argument or the Convention's primary mandate. Nothing in *Zicherman* suggests that local law may be employed to allow a successful party to circumvent the liability limits set out in the Convention, absent special circumstances not here relevant. The Supreme Court's declaration that the Convention does not "affect the substantive questions of *who* may bring suit and *what* they may be compensated for," 516 U.S. at 225, 116 S.Ct. 629 (emphasis added), has no bearing on the Convention's restrictions on the *amount* a party may recover. To the contrary, the Convention explicitly states that plaintiffs in suits for cargo damage are subject to the limitation of liabilities contained in Article 22 of the Convention. *See* Warsaw Convention, arts. 22, 24(1); *Tseng,* 525 U.S. at 171, 119 S.Ct. 662.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed as to all defendants except Gava S.p.A. We remand that case to the district court for a determination of the sufficiency of service of process on that defendant. The judgment insofar as it denied Commercial Union's petition for prejudgment interest is affirmed.